Joel B. Rothman (*Pro Hac Vice*)
Eliezer Lekht (*Pro Hac Vice*)
SRIPLAW
125 Maiden Lane
Suite 5C
New York, NY 10038
561.404.4350 – Telephone
561.404.4353 – Facsimile
Joel.rothman@sriplaw.com
eliezer.lekht@sriplaw.com
*Attorneys for Plaintiff VPR Brands, LP*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

| | |
|---|---|
| VPR Brands, LP, | No. CV-20-02185-PHX-DJH |
| Plaintiff/Counterclaim Defendant, | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| Jupiter Research, LLC, | |
| Defendant/Counterclaim Plaintiff. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND OF THE INVENTION ........................................... 3

III.  LEGAL STANDARD ........................................................................... 4

  A.   Intrinsic Evidence .......................................................................... 5

    1.   The claims define the invention. .............................................. 6

    2.   Limitations from the specification may not be read into the claims ......... 7

  B.   Extrinsic Evidence ........................................................................ 8

IV.   CONSTRUCTION OF THE CLAIM TERMS ........................................ 9

  A.   Disputed terms of the '622 Patent ................................................ 9

    1.   diaphragm microphone ............................................................ 9

    2.   electronic inhaler ................................................................... 11

    3.   time period and a magnitude of the electric current ................. 14

    time period and a magnitude of the electric current ...................... 14

  B.   Agreed upon claims and constructions ........................................ 15

    Single Chip Micyoco ...................................................................... 15

V.    CONCLUSION ................................................................................... 16

ii

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

## TABLE OF AUTHORITIES

Page(s)

Cases

*Beacon Adhesives, Inc. v. United States*,
134 Fed. Cl. 26 (2017) ...................................................................8

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ......................................................6

*DeMarini Sports, Inc. v. Worth, Inc.*,
239 F.3d 1314 (Fed. Cir. 2001) ......................................................5

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*,
214 F.3d 1302 (Fed. Cir.2000) .....................................................14

*Epistar Corp. v. Lowes Companies, Inc.*,
326 F. Supp. 3d 952 (C.D. Cal. 2018) ..........................................13

*Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.*,
93 F.3d 766 (Fed. Cir.1996) .........................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ......................................................7

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
690 F.3d 1318 (Fed. Cir. 2012) ......................................................5

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*,
309 F.3d 1365 (Fed. Cir. 2002) ......................................................9

*Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*,
2010 U.S. Dist. LEXIS 3588 *7 (S.D.N.Y. 2010) .........................5

*Joao v. Sleepy Hollow Bank*,
348 F. Supp. 2d 120 (S.D.N.Y. 2004) ..........................................11

*Key Pharm. v. Hercon Labs. Corp.*,
161 F.3d 709 (Fed. Cir. 1998) ........................................................8

iii

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998) ............................................................. 6

*Liebel-Flarsheim v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ............................................................... 8

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ......................................................... 4, 5, 6

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ............................................................. 5

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003) ............................................................. 7

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ........................................................... 13

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................... 5, 6, 8, 9

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ............................................................. 6

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
    983 F.3d 1367 (Fed. Cir. 2021) ........................................................... 11

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed Cir. 1985) ............................................................. 5

*Tate Access Floors, Inc. v. Maxess Techs., Inc.*,
    222 F.3d 958 (Fed.Cir.2000) ............................................................... 7

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d. 1313 (Fed. Cir. 2002) ........................................................... 5

*Va. Panel Corp. v. MAC Panel Co.*,
    133 F.3d 860 (Fed. Cir. 1997) ............................................................. 7

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ............................................................. 8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................... 5, 6

iv

SRIPLAW

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

1

2   Statutes

3   35 U.S.C. § 271.................................................................................................4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SRIPLAW

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

**SRIPLAW**

California ◆ Georgia ◆ Florida ◆ Tennessee ◆ New York

Plaintiff, VPR Brands, LP ("VPR") by and through its undersigned counsel, respectfully submits its opening claim construction brief pursuant to the Scheduling Order in this case entered February 26, 2021 (ECF 19), supported by the accompanying Declaration of Dr. George Yanulis ("Yanulis Decl."). Dr. Yanulis is a PhD engineer with expertise in bio-medical devices. He is offered by VPR as a technical expert and person skilled in the art (POSITA) at issue.

VPR asserts U.S. Patent No. 8,205,622 titled "Electronic Cigarette" (the "'622 Patent" or "patent-in-suit"). The '622 Patent claims priority to Chinese Patent Application No. 2009100801475 (the "'475 application"), which is incorporated by reference in its entirety in the '622 Patent specification. ('622 Patent col. 1, ln. 3-5.)

## I.    INTRODUCTION

The invention claimed in the '622 Patent covers a novel electronic cigarette ("e-cigarette") that is efficient to manufacture, easy to use, and closely simulates cigarette smoking. ('622 Patent, col. 2, ln. 23-25). All electronic cigarettes work by vaporization. Whereby a liquid is introduced, in a metered amount, to a high temperature heating element, which causes the liquid to be "vaporized" for inhalation by the user. The act of using an e-cigarette is colloquially known as "vaping."

VPR is a technology company whose assets include issued U.S. and Chinese patents for atomization-related products, including technology for medical marijuana oil vaporizers, dab pen and flower vaporizer products and components.  VPR is engaged in product development for the vapor or vaping market, including e-liquids, vaporizers and electronic cigarettes (also known as e-cigarettes) which are devices which deliver

1

nicotine and or cannabis and cannabidiol (CBD) through atomization or vaping, and without smoke and other chemical constituents typically found in traditional products.

Jupiter distributes one or more electronic cigarette products that practice all the steps of at least one claim of the '622 Patent. One of Jupiter's electronic cigarette products is known as LIQUID 6. Jupiter's LIQUID 6 is an electronic cigarette that contains a rechargeable battery that functions as a power source which supplies electric power to an electronic inhaler. In addition to the power source, the inhaler also includes an electric airflow sensor to detect air movement generated by a user's inhaling or puffing act.

The parties dispute the construction of the following three claim elements contained in claims 13 through 18 of the patent-in-suit.

| Claim Term | Appears in Claims |
|---|---|
| diaphragm microphone | 14, 17 |
| electronic inhaler | 13-18 |
| time period and a magnitude of the electric current | 13-15 |

VPR has proposed a construction based on the intrinsic evidence of the patent-in-suit as understood by POSITA. Jupiter has proposed a construction that is based on extraneous considerations that, if adopted, would improperly impose limitations on

2

CV-20-02185-PHX-DJH

1   VPR's invention. For the reasons that follow, VPR's three constructions should be

2   adopted and Jupiter's should be rejected.

3

4                    **II.    BACKGROUND OF THE INVENTION**

5          VPR's invention overcomes the following drawbacks of prior art e-cigarettes that

6   were available prior to the invention. ('622 Patent, col. 2, ln. 19-22.)

7          Prior to VPR's invention, e-cigarettes had several limitations: (1) circuit

8
    complexity that was costly to manufacture and maintain; (2) mechanical failures and
9
    limitations such as, fluid leakage, liquid reversal[1], users directly handling nicotine-liquid,
10
    discontinuous vaporizing, difficulty inhaling, and sub-standard sanitation; and (3)
11
    unreliable airflow sensors, which had short lifespans and were too sensitive to external
12

13  changes, such as outside temperature and humidity. ('622 Patent, col. 2, ln 4-12.)

14
           VPR's invention surpasses the prior art in several ways. *First*, VPR's invention
15
    features a cost-effective simplified circuit construction that allows for precise control of
16

17  the vaporization process, by employing a "Single Chip Micyoco." "Micyoco" is a short-

18  hand term of art used to refer to a microcontroller with an embedded processor system.

19  (Yanulis Decl. ¶¶ 9-13). The Micyoco processes the input signal and provides output

20
    instructions controlling the magnitude and duration of the current sent to the
21
    heating/vaporization element.
22

23         *Second*, VPR's invention features a cost-effective and disposable atomizer

24  structure that can be discarded when the e-liquid "chamber" is empty ('622 Patent, col. 3,

25

26

27

28  ─────────────
    [1] liquid reversal refers to the liquid going into the mouth of the user when the user puffs on the electronic cigarette

SRIPLAW ◆ CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

3

ln 6-9.) *Third*, VPR's invention employs an electronic airflow sensor that detects a user "puffing" on the e-cigarette. When the user puffs or inhales, the airflow sensor sends a signal directly to the Single Chip Micyoco. ('622 Patent, Summary of the Invention, col. 2, ln. 65 – col. 3, ln. 43.)

A summary of a preferred embodiment of the Invention is provided in col. 2 of the specification and it lays out a roadmap of the terms referenced in this brief:

> In a preferred embodiment, the connection between the electronic inhaler and electronic atomizer through the connectors on both parts forms an entire electronic cigarette. When the user puffs on the electronic cigarette through the air-puffing hole on the first end of the atomizer, the electronic sensor detects an airflow and converts it to a signal, which then wakes up the single chip micyoco to record the signal. The single chip micyoco guided by its embedded software instructions may turn on the electric power source to supply an electricity current with a predefined time length. This electric current preferably flows through the electric heat wire inside the atomizer tube, which then heats up the heat equalizer with absorbed liquid from the liquid-container. The heated equalizer converts the liquid into a form of vapor mist which is finally drawn into the month of the user. This completes an entire cycle of vaporizing process from which the user gets satisfaction of "smoking."

('622 Patent, col. 2, ln. 48-64).

## III.    LEGAL STANDARD

A patent infringement analysis under 35 U.S.C. § 271 requires, as a first step, that the Court construe the meaning of the disputed patent claim terms as a matter of law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

The purpose of claim construction is for the Court to determine what the disputed claim terms mean "'in order to understand and explain, but not to change, the scope'" of

4

SRIPLAW

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

the claim. *Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, 2010 U.S. Dist. LEXIS

3588 *7 (S.D.N.Y. 2010), *quoting DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314,

1322 (Fed. Cir. 2001) (internal quotations omitted).  Claims are "construed without

reference to the accused device [or product]." *SRI Int'l v. Matsushita Elec. Corp. of Am.*,

775 F.2d 1107, 1118 (Fed Cir. 1985).

Claim terms are not construed in a vacuum, *Medrad, Inc. v. MRI Devices Corp.*,

401 F.3d 1313, 1319 (Fed. Cir. 2005). It is well-settled that, in interpreting an asserted

claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself,

including the claims, the specification and, if in evidence, the prosecution history. *See*

*Markman*, 52 F.3d at 979, 34 USPQ2d at 1329. Such intrinsic evidence is the most

significant source of the legally operative meaning of disputed claim language. *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

### A.    Intrinsic Evidence

Within the "intrinsic evidence," courts first look to the words of the claims.

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d. 1313, 1324 (Fed. Cir. 2002); *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The words of the

claims are generally given their ordinary and customary meaning as understood by a

person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415

F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); accord, *InterDigital Commc'ns, LLC v.*

*Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *Vitronics*, 90 F.3d at 1582.

The ordinary and customary meaning of a claim term may be determined solely by

viewing the term within the context of the claim's overall language.  See, *Phillips*, 415

5

F.3d at 1314 ("[T]he use of a term within the claim provides a firm basis for construing the term.").

Claim terms should be construed in a manner that is consistent with the scope of the patent's specification. See *Markman*, 52 F.3d at 979. The specification is the best guide for construing the claims. See *Phillips*, 415 F.3d at 1315; *Vitronics*, 90 F.3d at 1582. Courts must construe claim terms consistent with the rule that limitations in the specification may not be read into the claims. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l*, 775 F.2d at1121.

Courts should define disputed claims by looking "first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics,* 90 F.3d at 1582 (internal quotations omitted).

### 1.    The claims define the invention.

Claim construction "begins and ends" with the words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id*. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id*. "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id*.

CV-20-02185-PHX-DJH

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Merck & Co. v. Teva Pharms. USA, Inc*., 347 F.3d 1367, 1371 (Fed. Cir. 2003). "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id*. (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* "[C]laims must be construed so as to be consistent with the specification, of which they are a part." *Merck*, 347 F.3d at 1371.

### 2. Limitations from the specification may not be read into the claims

"Although claims must be read in light of the specification of which they are part, ... it is improper to read limitations from the written description into a claim." *Tate Access Floors, Inc. v. Maxess Techs., Inc*., 222 F.3d 958, 966 (Fed. Cir. 2000); *Va. Panel Corp. v. MAC Panel Co*., 133 F.3d 860, 866 (Fed. Cir. 1997) ("Device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent.").

Claims should only be interpreted in a restricted manner if the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of

7

manifest exclusion or restriction." *Liebel-Flarsheim v. Medrad, Inc*., 358 F.3d 898, 906 (Fed. Cir. 2004). "When more than one embodiment is disclosed, as a matter of law, the court 'do[es] not interpret claim terms in a way that excludes disclosed examples in the specification.'" *Beacon Adhesives, Inc. v. United States*, 134 Fed. Cl. 26, 36 (2017)(quoting *Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1305 (Fed. Cir. 2007).

### B.    Extrinsic Evidence

Extrinsic evidence includes dictionaries, technical treatises, and expert declarations that the Court may use to help understand the underlying technology and the manner in which one skilled in the art might use the claim terms. *Phillips*, 415 F.3d at 1318. An expert's supported assertions as to a term's definition is helpful to the Court when there is an ambiguity. *Id*.

Ultimately, however, "extrinsic evidence" is not as significant as "intrinsic evidence" in defining claim terms. *Phillips*, at 1317. Courts should discount any extrinsic evidence "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id*. at 1318 (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)) (internal quotations omitted).

Once the proper meaning of a term used in a claim has been determined, the term must have the same meaning for al1 claims in which it appears. *Phillips,* at 1314

8

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

(citations omitted); *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

## IV.    CONSTRUCTION OF THE CLAIM TERMS

### A.    Disputed terms of the '622 Patent

#### 1.    diaphragm microphone

| Claim Term | VPR's Proposed Construction | Jupiter's Proposed Construction |
|---|---|---|
| diaphragm microphone | A device for converting pressure waves into electrical energy using a thin sheet of material that is capable of vibrating. | A device, used in recording or transmitting sound, for converting sound waves into electrical currents or voltages containing a flexible diaphragm that vibrates as it makes contact with sound waves and converts sound waves into analogous electrical waves. The diaphragm movement modulates an electrical current by various methods such as changing a capacitance or producing a voltage based on the vibration of the diaphragm. |

VPR's proposed construction is based on the ordinary meaning of the term "diaphragm microphone" as understood in the art and used in the '622 Patent specification. (Yanulis Decl. ¶15).  Jupiter's construction improperly narrows the definition of "diaphragm microphone" by importing limitations from unwarranted extrinsic evidence that is inconsistent with the '622 Patent claims and specification (i.e the intrinsic evidence), and must be rejected. *Phillips*, at 1317.

A "microphone" refers to a device used to detect sound waves. Microphones detect sound and provide a signal used to amplify, record or transmit the sound detected. The microphone described in the '622 patent is not used to amplify the voices of singers

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

9

on stage. Rather, one skilled in the art readily understands from the '622 patent specification that the diaphragm microphone of the claimed invention is the type that detects airflow, rather than the type used for the amplification, recording or transmission sound as described by Jupiter.

A microphone uses a thin membrane, called a diaphragm, to detect sound waves. (Yanulis Decl. ¶18). The thin diaphragm membrane vibrates in response to changes in pressure caused by sound waves or, in the case of the present invention, airflow across the diaphragm. (Yanulis Decl. ¶19). The patent claims make clear that the diaphragm microphone is an airflow sensor that detects the airflow generated by the user "puffing" on the e-cigarette when the airflow passes across the diaphragm. ('622 Patent, Claims 14 and 17, reciting "the airflow sensor is diaphragm microphone.").

A diaphragm microphone is sensitive to airflow. The present invention relies on that sensitivity to detect airflow caused by a user's "puffing" or inhaling action and converts the vibrations created by that airflow into an electrical signal. The patent-oin-suit recites "[t]he user puffs on the end of the electronic cigarette with the air-puffing hole to activate the CPU processor through detection of an airflow signal…". ('622 Patent, col. 5, ln. 62-64). The airflow signal is converted into an electrical signal by the microphone and sent to a microprocessor/control unit ("micyoco") which, in turn, controls the vaporization process by "generat[ing] an electric current flowing through the electric heating wire, which achieves vaporization of the solution inside the liquid container." ('622 Patent, col. 5, ln. 62-64).

10

Jupiter's proposed construction does not rely on the intrinsic evidence. Jupiter's construction uses extrinsic evidence of the colloquial definition of a microphone. Jupiter's construction renders the "diaphragm microphone" claim element nonsensical. Construing the "diaphragm microphone" term as Jupiter urges in the context of the specification (and, generally, in the art of e-cigarettes and vaporizers), makes no sense whatsoever. See, e.g., *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1380 (Fed. Cir. 2021)(citing, *Joao v. Sleepy Hollow Bank*, 348 F. Supp. 2d 120, 124 (S.D.N.Y. 2004)(refusing to adopt the "grammatically correct" interpretation of a claim term where it "would render the claims utter nonsense."))

Adding a limitation that the diaphragm microphone for the e-cigarette of the present invention must either "record[] or transmit[] sound" "render[s] the claim utter nonsense" to one skilled in the art, and Jupiter's proposed construction must be rejected. *Joao,* 348 F. Supp. 2d at 124.

Accordingly, this court should adopt VPR's proposed construction of the term "diaphragm microphone" because it is based on the intrinsic evidence as understood by POSITA.

2.    electronic inhaler

| Claim Term | VPR's Proposed Construction | Jupiter's Proposed Construction |
|---|---|---|
| electronic inhaler | A tubular housing comprising one or more electrical components and one or more holes to allow airflow. | An inhaler tube receiving electrical power, having an electrical connection with an electronic atomizer, a cigarette cap with holes for air inflow, LED indicator, electric power source, annular tube with cap, integrated circuit board with CPU processor, electric airflow sensor, sensor supporter, |

11

| | | electric connector, inserted rush pith surrounded by a silica gel insulator, that fits together with the electronic atomizer. |
|---|---|---|

VPR's proposed construction is based upon the ordinary meaning of the term "electronic inhaler" as understood in the art, in the context of the '622 Patent specification. An inhaler is well understood in the art of e-cigarettes (and similar medicine-delivery devices) as the portion of inhalation device that the user "puffs" on to draw air through the device.[2] (Yanulis Decl. ¶20).

Moreover, the '622 patent further specifies the electronic inhaler to preferably include one or more of an electric power source, electric sensor, single chip micyoco, and LED indicator. The preferred embodiment of the inhaler, however, does not limit the definition of the inhaler to include the above components.

Furthermore, the '622 patent further explains that on the first end of the inhaler tube may be a cigarette cap with a small hole for airflow. On the second end of the tube may be an electric connector with either outskirt screw thread or a DC socket.

Jupiter's construction seeks to improperly narrow the definition of an "electronic inhaler" by importing limitations from the specification (and other claim elements), and from specific embodiments, that limit the term "inhaler." Jupiter's limitations have no place in the definition of this term.

For example, Jupiter's construction requires various components including "an electrical connection with an electronic atomizer, a cigarette cap with holes for air inflow,

---

[2] Once the atomizer is activated, the "puffing" action also delivers the vaporized medical substance (or nicotine in the case of e-cigarettes) to the user.

12

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

LED indicator, electric power source, annular tube with cap, integrated circuit board with CPU processor, electric airflow sensor, sensor supporter, electric connector, [and] inserted rush pith surrounded by a silica gel insulator." The intrinsic evidence of the patent-in-suit does not support Jupiter's attempt to require these components in order to define the claim term "electronic inhaler."

The term "inhaler" as used in the claims of the patent-in-suit does not contain the limitations Jupiter proposes, and reading Jupiter's limitations into the claims from specific embodiments of the invention is improper. See, e.g., *Epistar Corp. v. Lowes Companies, Inc.*, 326 F. Supp. 3d 952, 960 (C.D. Cal. 2018)("limitations of the described embodiments of the invention must not be read into the claims").

The "622 Patent explicitly states that the additional elements are optional features of a preferred embodiment, and not requirements for the term inhaler.

> The inhaler ***preferably includes*** one or more of an electric power source, electric sensor, single chip micyoco, and LED indicator. The electric power source, which can be a rechargeable or non-rechargeable battery, supplies electricity to the atomizer to vaporize a liquid inside an atomizer chamber.

('622 Patent, col. 2, ln. 30-35) (emphasis added).

Several of the limitations that Jupiter attempts to read into the definition for "electronic inhaler" are, in fact, separate claim elements for the claims at issue, such as the electric power source, CPU processor, and electric airflow sensor.  Reading these limitations into the definition of "electronic inhaler" would improperly render the elements superfluous. See *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)("A claim construction that gives meaning to all the terms of the claim is

13

SRIPLAW

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

1   preferred over one that does not do so.")(citing *Elekta Instrument S.A. v. O.U.R. Sci. Int'l,*

2   *Inc.*, 214 F.3d 1302, 1307 (Fed. Cir.2000) (construing claim to avoid rendering the []

3   claim limitation superfluous); *Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.*, 93 F.3d 766,

4   770 (Fed. Cir.1996) (rejecting the district court's claim construction because it rendered

5

6   superfluous the claim requirement for openings adjacent to the end walls)).

7       VPR's proposed construction for the "electronic inhaler" represents the ordinary

8   meaning as understood in the art, consistent with the intrinsic evidence. Jupiter's

9

10  proposed definition improperly imports additional limitations from the specification and

11  from separate elements of the claims at issue. VPR's construction , and should be adopted

12

13  by the Court.

14       **3.    time period and a magnitude of the electric current**

15

| Claim Term | VPR's Proposed Construction | Jupiter's Proposed Construction |
|---|---|---|
| **time period and a magnitude of the electric current** | The duration of time and the strength of the current that is provided to the heating element. | Time period is undefined. Magnitude is the magnitude of electric current supplied by the power source. |

19       VPR respectfully submits that the term "time period" as used in the '622 patent

20

21  has an ordinary and plain meaning. A "time period" is well understood as a period (or

22  duration) of time that something occurs. As used in the '622 patent, the "time period of

23  the electric current" is the amount of time (duration) that the power supply provides the

24

25  electric current to the heating element.  (Yanulis Decl. ¶34).

26       The '622 Patent provides context to the term when describing a function of the

27  SCM: "wherein the Single Chip Micyoco receives the signal from the electric airflow

28  sensor, instructs the electric power source to send an electric current to the electronic

atomizer, and **a time period and a magnitude** of the electric current." ('622 Patent, col. 7-8, ln. 45-46,1-3.)

However, Jupiter's proposal states that the term "time period is undefined". Jupiter is incorrect. This proposal should not be given any merit as it lacks any logical explanation, especially when viewed in light of the '622 patent specification. "A time period", refers to the duration or "amount of time". (Yanulis Decl. ¶36).

Additionally, Jupiter seeks to define a term by using that same term in its definition, stating "magnitude is the magnitude…". Defining "magnitude" as "magnitude" is circular reasoning. As used in the '622 Patent, "magnitude" refers to the strength or "the amount of charge flowing at a particular point". (Yanulis Decl. ¶37).

## B.    Agreed upon claims and constructions

The parties agree on the following constructions of the following terms:

| Claim Term | Appears in Claims | Proposed Construction |
|---|---|---|
| Single Chip Micyoco | 13,14,15,16 | A microcontroller including a processor, software instructions to be executed by the processor, memory, and I/O processed by the processor. |
| electronic cigarette | 13,14,15,16,17,18 | A device operating with the aid of electricity containing a substance that is vaporized/atomized and inhaled |
| Tubular | 13,14,15,16,17,18 | A hollow length of material having substantially parallel sides defining an open space |
| Electronic atomizer | 13,14,15,16,17,18 | A device that converts a solution of a liquid form through vaporization or atomization to a gas form, using electric current. |
| Power Source | 13,14,15,16,17,18 | A rechargeable or non-rechargeable battery |
| LED indicator | 15,16 | A light emitting diode that lights up when the electric current flows and it is turned off when the electric current stops flowing |
| Electric airflow sensor | 13,14,15,16,17,18 | An electric sensor to detect air movement generated by a user's inhaling or puffing act. |

15

CV-20-02185-PHX-DJH

| Claim Term | Appears in Claims | Proposed Construction |
|---|---|---|
| That is detecting air flow | 13, 14, 15, 17, 18 | detecting air movement generated by a user's inhaling or puffing act |
| (sending a) signal | 13, 14, 15 | Any signal provided by the airflow sensor responsive to airflow. |
| instructs | 13, 14, 15 | Provides a signal that tells the power supply to provide or not provide electricity to the inhaler and atomizer. |
| Cigarette Cap | 16 | A cap with holes attached to the device. |
| Circuit Board | 16 | A board on which electronic components are mounted. |
| detachably attached | 17 | Able to be connected and then separated. |
| Electric connector | 16, 18 | A conductive contact |
| air puffing hole | 17, 18 | Hole through which air can be drawn by a user. |
| detecting an airflow | 13, 14, 15, 17, 18 | Determining that a user is inducing airflow into or out of the device. |
| heat equalizer | 18 | A thermally conductive material capable of withstanding high temperatures that distributes the heat from a heat source. |
| supporting piece | 18 | A piece made of material able to withstand high temperatures that supports that supports one or more electrical components. |

## V.    CONCLUSION

VPR's proposed constructions are based upon the intrinsic evidence as understood by POSITA. Jupiter's disputed constructions are not based on the intrinsic evidence, improperly import extrinsic limitations into the claims, and find no support in the context of the claims and the specification.  Accordingly, this Court should adopt VPR's proposed constructions for each of the disputed claim terms, and adopt the agreed upon proposed construction for the agreed claim terms.

16

CV-20-02185-PHX-DJH

1    Dated:   November 22, 2021                  Respectfully submitted,

2                                                */s/ Eliezer Lekht*
3                                                Eliezer Lekht (Pro Hac Vice)
                                                 Joel B. Rothman (Pro Hac Vice)
4                                                **SRIPLAW**
                                                 *Attorneys for Plaintiff VPR Brands, LP*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on November 22, 2021, a true and correct copy of the foregoing document was served by electronic mail by the Court's CM/ECF System to all parties listed below on the Service List.

*/s/ Eliezer Lekht*
Eliezer Lekht, Esq.

Albert L. Schmeiser
Schmeiser, Olsen & Watts LLP
18 East University Drive
Suite 101
Mesa, AZ 85201
AZ@IPLawUSA.com
aschmeiser@iplawusa.com
*Attorney for Jupiter Research, LLC*

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

18

CV-20-02185-PHX-DJH